**PALMS OF PASADENA HOSPITAL, Appellant,**

v.

**Louis SULLIVAN, M.D., Secretary of the Department of Health and Human Services, Appellee.**

No. 90–5178.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1991.

Decided May 17, 1991.

Patric Hooper, Los Angeles, Cal., for appellant.

David S. Cade and Gerard Keating, Attys., Dept. of Health and Human Services, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Michael J. Astrue, Gen. Counsel, Darrel J. Grinstead, Associate Gen. Counsel, and Henry R. Goldberg, Deputy Associate Gen. Counsel, Dept. of Health and Human Services, were on the brief, for appellee.

Before RUTH BADER GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Palms of Pasadena Hospital is a 300–bed hospital operating in the City of South Pasadena, Florida. At all relevant times, some of its patients were covered by Medicare. When Palms provided health care services to these patients, the Medicare program reimbursed Palms for the "reasonable cost" or the "customary charges" for those services, whichever was less. 42 U.S.C. § 1395f(b)(1). At the end of each fiscal year, Palms reported the costs it had incurred and the portion of those costs it had allocated to the Medicare program. Blue Cross and Blue Shield of Florida, Inc., a "fiscal intermediary," audited Palms' cost reports and determined how much Medicare owed the hospital. 42 U.S.C. § 1395h(a). A more detailed description of Medicare's "reasonable cost reimbursement" system, which has for the most part been replaced, is set forth in *Washington Hospital Center v. Bowen*, 795 F.2d 139, 141 (D.C.Cir.1986), and *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345, 346–49 (D.C.Cir.1987).

The controversy here relates to Blue Cross's disallowance of a portion of the costs claimed by Palms during the fiscal years ending in 1982, 1983, and 1984. Palms had entered into a contract with Pharmaceutical Services, Inc., to run the hospital's pharmacy. Pharmaceutical Services was to provide all drugs, medications and supplies, and the staff needed to dispense these products. Palms added the

pharmacy charges to the bills of its Medicare and non-Medicare patients and had sole responsibility for collection. Under the terms of the original agreement, Palms was to "retain" 54 percent of the total pharmacy billings; the parties later modified the wording of the contract to state that Palms would retain 51 percent of the total pharmacy billings "and an additional three percent (3%) as reimbursement for uncollectible accounts." A separate agreement, not in issue, provided for a 5 percent reimbursement from Pharmaceutical Services to Palms for data processing and administrative services. Palms paid the difference—41 percent of pharmacy billings—to Pharmaceutical Services on a monthly basis.

Blue Cross denied Palms' request for payment of the 3 percent "reimbursement for uncollectible accounts," treating Palms' cost as 41 percent of pharmacy billings, the amount Palms actually paid to Pharmaceutical Services. Palms therefore received about $650,000 less than it claimed. Palms appealed to the Provider Reimbursement Review Board pursuant to 42 U.S.C. § 1395oo (f)(1). The Board is comprised of five members, two of whom must be representatives of health care providers and at least one of whom must be a certified public accountant. 42 U.S.C. § 1395oo (h). The Board sustained the decision of Blue Cross in a written opinion. Palms sought review in the district court. After hearings and a remand, the district court upheld the Board. For the reasons that follow we affirm.

Under the regulations of the Secretary of Health and Human Services, bad debts "are not to be included in allowable cost"; they are considered reductions in revenue. 42 C.F.R. § 413.80(a) & (c). (The regulations were originally set forth at Part 405 of 42 C.F.R., but were redesignated without any pertinent changes as Part 413 in 1986, 51 Fed.Reg. 34,790, which is the Part we shall cite.) Bad debts relating to Medicare patients can arise when these patients fail to pay their deductible or coinsurance despite the hospital's bona fide attempts at collection. 42 C.F.R. § 413.5(c)(6). If Medicare does not reimburse providers for

these losses, this "could result in the related costs of covered services being borne by other than Medicare beneficiaries." 42 C.F.R. § 413.80(d). Medicare therefore steps in and compensates the provider for its losses, but it does so only after the Medicare patients' accounts actually become worthless. 42 C.F.R. § 413.80(f). Pursuant to this method, Medicare paid Palms a single amount for each bad debt relating to a Medicare patient, regardless of which hospital services gave rise to the debt.

Palms invokes accounting principles to support its position that its actual pharmacy cost, which it puts at 44 percent of billings, was unaffected by the 3 percent of billings it "retained" for uncollectible accounts. The regulations require private health care providers to report cost data on the accrual basis of accounting. 42 C.F.R. § 413.24(a). Revenue is recognized when earned, regardless of when collected, and expenses are recognized when incurred, regardless of when paid. 42 C.F.R. § 413.24(b)(2). When an account receivable is created, bad debt expense—estimated in light of experience—is reported. In view of the regulation and generally accepted accounting principles, Palms classifies the disputed 3 percent as revenue compensating it for bad debt expense. As Palms sees it, the effect of its contractual arrangement is the same as if it wrote a check to Pharmaceutical Services for 44 percent of the billings and then received a check from Pharmaceutical Services for 3 percent. (For the sake of simplicity, we treat the uncontested 5 percent reimbursement for administrative services as a reduction of Palms' cost.) That 3 percent payment, according to Palms, would be matched against its 3 percent bad debt expense. Under accrual accounting, Palms would still book 44 percent of the total billings as its cost of running the pharmacy.

The Secretary points out, correctly it seems, that Palms' accounting treatment flies in the face of the bad debt regulations in 42 C.F.R. § 413.80. The basic effect of these provisions is to bar providers from reporting bad debts on an accrual account-

ing basis. Rather, some bad debts—those arising from the failure of Medicare patients to pay their deductible or coinsurance amounts—are to be treated as if the provider were on a cash basis. That is, the provider reports (and is then reimbursed for) such Medicare bad debts only in the accounting period when the particular account receivable actually becomes worthless. The Provider Reimbursement Review Board recited the fiscal intermediary's argument along these lines and mentioned the bad debt regulation in its opinion. But so far as we can tell, the Board did not rest its decision on that ground. We therefore agree with Palms that the Board's decision must stand or fall in light of the reasons actually given in its written opinion. *See SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Biloxi Regional Medical Center v. Bowen*, 835 F.2d at 348 n. 12.

The Board's stated ground for rejecting Palms' position was that it violated the regulation limiting reimbursement for reasonable costs of services covered by Medicare to "actual costs." 42 C.F.R. § 413.9(c)(2). There is ample support for the Board's view. Assume the 3 percent figure accurately predicts the amount of bad debts that will arise in the pharmacy's operations and that all of Palms' patients were covered by Medicare. In the medium run, for every $100 in billings, Palms would therefore collect $97. Of this amount it would have paid Pharmaceutical Services $41 and would have kept, pursuant to its contract, $56. If it had its way, Palms would then collect $44 from Medicare and wind up with a grand total of $100 for each $100 of pharmacy billings. This exposes a problem—namely, that Medicare reimburses Palms for the bad debts of Medicare patients generally (as it did here). The $3 therefore could not be an "actual cost" to Palms.

To solve this "double-counting" problem, Palms suggested in the administrative proceedings and in the district court that it could offset the part of uncollected pharmacy billings attributable to patients covered by Medicare. How one should determine the amount of pharmacy charges embedded in the unpaid portion of a Medicare patient's bill is not apparent. Still less is it apparent why the Secretary should have to tolerate such complexity.

The 3 percent of billings Palms retained was not a reimbursable cost actually incurred by Palms. The amount represented merely an estimate of the receivables Palms ultimately would not collect. The Board therefore properly rejected Palms' argument on the ground that the Secretary's regulation concerning the "reasonable costs of services covered under Medicare and related to the care of beneficiaries" limited reimbursement to "actual costs." 42 C.F.R. § 413.9(c)(2). Accrual accounting principles might specify something different, but the Board was concerned with statutory principles implemented by regulations. *Richey Manor, Inc. v. Schweiker*, 684 F.2d 130, 133–34 (D.C.Cir. 1982). The judgment of the district court is affirmed.