**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MISSION HOSPITAL REGIONAL MEDICAL CENTER, *Petitioner-Appellant*, v. SYLVIA MATHEWS BURWELL, in her official capacity as Secretary of Health and Human Services, *Respondent-Appellee.* | No. 13-56264 D.C. No. 8:12-cv-01171-AG-JPR OPINION |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
October 21, 2015—Pasadena, California

Filed April 11, 2016

Before: Stephen S. Trott, Andrew J. Kleinfeld,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Trott

# SUMMARY[*]

## Medicare

The panel affirmed the district court's judgment in favor of the Secretary of Health and Human Services in an action challenging the Secretary's determination that Mission Hospital Regional Medical Center was not entitled to bill Medicare for patient services at its new facility in Laguna Beach, California – formerly South Coast Medical Center – until that facility had a provider agreement of its own.

On June 30, 2009, Mission Hospital, a Medicare-approved acute care hospital, purchased the assets of South Coast, also a Medicare-approved facility. Mission Hospital attempted by an assets-only purchase to avoid South Coast's potential liabilities under South Coast's Medicare provider agreement. Mission Hospital alleged that former 42 C.F.R. § 489.13(d)(1)(i) permitted it to avoid South Coast's Medicare liabilities by submitting Centers for Medicare and Medicaid Services form 855A requesting that Mission Hospital's provider agreement encompass South Coast effective July 1, 2009; or, alternatively, Mission Hospital was entitled to the benefit of the retroactivity provision in 42 C.F.R § 489.13(d)(2).

The Secretary rejected Mission Hospital's contentions. The Secretary's decision blocked Mission Hospital from collecting $1.4 million for services rendered between July 1, 2009 and September 29, 2009 at South Coast, and roughly $7

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

million for normally Medicare eligible services between July 1, 2009 and March 18, 2010, when the South Coast campus was finally accredited and properly enrolled as a provider in Medicare.  The Departmental Appeals Board adopted the Secretary's decision.

The panel concluded that the Secretary's interpretations, and decisions rendered by the Departmental Appeals Board, were reasonable. The panel held that private parties have no power to alter their legal obligations with Medicare under their provider agreements.  The panel also held that the retroactivity provisions in 42 C.F.R. § 489.13(d)(2) were inapplicable.

### COUNSEL

William E. Quirk (argued), Polsinelli PC, Kansas City, California; Wesley D. Hurst, Polsinelli LLP, Los Angeles, California; and Jason T. Lundy, Polsinelli PC, Chicago, Illinois, for Petitioner-Appellant.

Kathleen Unger (argued), and Deborah Yim, Assistant United States Attorneys, Los Angeles, California, for Respondent-Appellee.

**OPINION**

TROTT, Circuit Judge:

On June 30, 2009, Mission Hospital Medical Center ("Mission"), a Medicare-approved acute care hospital in Mission Viejo, California, purchased from Adventist Health Systems West ("Adventist") the assets of South Coast Medical Center ("South Coast"), in Laguna Beach, California, also a Medicare-approved facility. However, Mission attempted by an assets-only purchase to avoid South Coast's potential liabilities under South Coast's Medicare provider agreement. These liabilities encompassed potential mandated reimbursement to Medicare for any previous overpayments made to South Coast. Parenthetically, this labyrinthine system is not a one-way street. Should Medicare determine it has underpaid a hospital, for example with respect to "outlier" costs for a beneficiary requiring higher treatment costs than anticipated in the Prospective Payment System ("PPS") system, Medicare will subsequently compensate the provider accordingly. How complicated is this process, and how long does it take? We attach 42 C.F.R. § 412.84, *Payment for extraordinarily high-cost cases (cost outliers)* as an Appendix. This daunting regulation demonstrates why continuity is contemplated by the Medicare system.

As a consequence of Mission's decision to purchase only South Coast's assets, the Secretary of the U.S. Department of Health and Human Services (the "Secretary") duly determined that Mission was not entitled to bill Medicare for patient services at its new facility until that facility had a provider agreement of its own. This decision blocked Mission from collecting $1.4 million for services rendered

between July 1, 2009, and September 29, 2009, at South Coast, which was now known as Mission's Laguna Beach campus, and roughly $7 million for normally Medicare eligible services between July 1, 2009, and March 18, 2010, when the Laguna Beach campus was finally accredited and properly enrolled as a provider in Medicare.

Seeking remuneration for services provided, Mission appealed the Secretary's decision, first to the Department of Heath and Human Services (the "Department") Civil Remedies Division. An Administrative Law Judge ("ALJ") ruled in favor of the Department. Mission appealed the ALJ's decision to the Departmental Appeals Board ("DAB"), losing once again. The next stop was the district court, where it suffered the same fate. Mission now appeals the Secretary's decision to us.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## A.

First, we explain what this controversy is not about. It is not about general unknown liabilities that might have arisen after the purchase date, for example from malpractice lawsuits, wrongful denial of privileges lawsuits, or construction and real estate disputes. This case deals only with the continuity of provider agreement contractual liability for Medicare overpayments, which are not ascertainable until Medicare accounting, calculating, and reconciliation, and which might not occur until years after initial billing. *See* 42 U.S.C. § 1395g(a). Nothing in this opinion should be

taken to limit or restrict assets-only purchases of medical providers, or Medicare reimbursements to assets-only purchases, so long as the assets-only purchase makes an exception for Medicare reimbursement of overpayments. We note that, "[b]y encompassing a system of interim payments on an estimated cost basis, subject to year-end accounting, the program ensures Medicare providers a steady flow of income sufficient to provide service." *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994). This complex but routine PPS adjustment, reconciliation, and reimbursement accounting process, to which all providers are subject, undoubtedly eliminates serious cash flow problems they would otherwise encounter.

Second, this controversy does not involve an attempt by Medicare to recover overpayments made to South Coast, or for that matter, whether Medicare has recovered any such payments from Adventist, South Coast's previous owner. At issue is only whether Mission can recover from Medicare for services rendered as of the date of its operation of South Coast as its Laguna Beach campus.

In addition, both parties agree that South Coast's provider agreement terminated as of June 30, 2009, after South Coast submitted a standard form CMS 855A Enrollment Application notifying the Centers for Medicare and Medicaid Services ("CMS") of the impending acquisition and requesting a change in its enrollment. Mission admits that

> [b]ecause Mission Hospital did not acquire South Coast's liabilities, including those related to its provider agreement, South Coast's provider agreement terminated upon South Coast's acquisition. This is the very

reason that the hospitals filed their forms 855A to bring the South Coast / Laguna Beach campus under Mission Hospital's provider agreement upon South Coast's acquisition.

A.O.B. 29–30.

**B.**

Nevertheless, Mission asserts that former 42 C.F.R. § 489.13(d)(1)(i) permitted it to avoid South Coast's Medicare liabilities simply by submitting, along with South Coast, CMS form 855A to CMS "requesting that Mission's Medicare provider agreement encompass the Laguna Beach campus effective July 1, 2009." Mission argues that its submission of this form complied with § 489.13(d) (effective until September 30, 2010) and should have made July 1, 2009, the effective date of Medicare enrollment for the Laguna Beach campus under Mission's existing provider agreement and without a new accreditation survey. Mission admits that it "deliberately did not take on the liabilities of South Coast which was owned by Adventist Health. We left those liabilities there. Those are between Medicare and Adventist." Mission also admits it did not rely on CMS when it made the decision to attempt this gambit to circumvent § 489.18(d), but instead on "statements made to us by Medicare contractors."

In the alternative, Mission maintains it is entitled to the benefit of the retroactivity provision in § 489.13(d)(2). This section says that the effective date of a provider like Mission *may* be retroactive for up to one year from unpaid covered services provided to a Medicare beneficiary.

## II

Not so fast, says the Secretary. Mission's argument is too clever by half. Granted, 42 U.S.C. § 489.18(c) says that "[w]hen there is a change of ownership . . . , the existing provider agreement will automatically be assigned to the new owner," here, Mission. However, § 489.18(d) as it read in 2009, provided that "[a]n assigned agreement is subject to *all* applicable statutes and regulations and to *the terms and conditions* under which it was *originally* issued." (Emphasis added). We note that this language talks about the terms and conditions under which the *existing* provider agreement was *originally* issued. The regulation does not say that the provider agreement shall contain new identical terms and conditions that are forward-looking only. The regulation, which Mission tried to circumvent, provides continuity of obligations, continuity which is essential to the functioning of Medicare's Prospective Payment System. The regulation talks about an assignment, not a new beginning with a clean slate on new terms. We note there is a three-year statute of limitation on this adjustment arrangement.

One of the substantive and significant "conditions" in South Coast's Medicare provider agreement was an obligation to reimburse Medicare for any overpayments it might have received. *See* 42 U.S.C. § 1395g; 42 C.F.R. §§ 405.1803(c), 413.64(f); *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1012 (9th Cir. 2000). However, Mission extinguished South Coast's provider agreement and voluntarily refused to assume South Coast's contractual liability to return overpayments to Medicare. Consequently, Mission did not and could not take assignment of South Coast's provider agreement. Accordingly, the Laguna Beach campus on July 1, 2009 became for Medicare purposes a "new hospital,"

without a provider agreement.  42 C.F.R. § 412.84(i)(3)(i) defines a "new hospital" as "an entity that has not accepted assignment of an existing hospital's provider agreement in accordance with § 489.18 of this chapter." *See also* 42 C.F.R. §§ 412.230, 412.525(a)(4)(iv)(C)(1), 412.529(f)(4)(iii)(A), 419.43(d)(5)(iii)(A).   It follows that the Laguna Beach campus was not enrolled in Medicare after Mission acquired it as a "new hospital" on June 30, 2009.  Thus, the effective date of the enrollment of the Laguna Beach campus could not be fixed until it was separately accredited with its own provider agreement.

As it turned out, The Joint Commission, an independent non-profit organization that accredits and certifies more than 20,500 health care organizations and programs in the United States, conducted an unannounced accreditation survey of the Laguna Beach campus on March 2, 2009.   The Joint Commission reported finding two material deficiencies under the medical records condition of participation. *See* 42 C.F.R. § 482.24.  Mission complains that these deficiencies were not material, but they were material to The Joint Commission and CMS – and that's what counts.  The Joint Commission did not clear the Laguna Beach campus for accreditation by CMS until after the deficiencies were remedied.  Only then was the Laguna Beach Campus enrolled, accredited, and authorized to bill services provided to Medicare beneficiaries.

The DAB adopted and validated the Secretary's interpretation and application of the regulations for which she is responsible.

> Mission's Laguna Beach campus did not meet this threshold requirement [of current accreditation] by virtue of Mission's July 1,

2009 asset purchase because, as already discussed, Mission did not assume all of South Coast's outstanding liabilities and therefore Mission could not continue to operate the Laguna Beach campus under South Coast's provider agreement or South Coast's accreditation. Moreover, as discussed below, The Joint Commission extended Mission's accreditation to the Laguna Beach campus only as of March 18, 2010. As a consequence, until that date, the Laguna Beach campus did not meet "all requirements" within the meaning of section 489.13(d)(1)(i), i.e., the hospital conditions of participation it could be deemed to meet on the basis of accreditation. Accordingly, the effective date of billing privileges for services provided at Mission's Laguna Beach campus could not be earlier than March 18, 2010, notwithstanding the fact that the sole additional requirement under section 489.13(d)(1)(i) – submission of an enrollment application – was met even before July 1, 2009.

## III

Federal law fixes the relationships and responsibilities of Medicare with beneficiaries and providers. These relationships and responsibilities are beyond the reach of private parties such as Mission and South Coast to alter. The liabilities of a Medicare provider are as different from the liabilities in a typical assets-only purchase, as chalk is from cheese. Mission as a provider was aware of all of these rules and obligations when it attempted to short-circuit the system

in its favor. "As a participant in the Medicare program, [Mission] had a duty to familiarize itself with the legal requirements for cost reimbursement." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

Our sister circuit's opinion in *United States v. Vernon Home Health, Inc.*, 21 F.3d 693 (5th Cir. 1994), informs and is consistent with our opinion. In *Vernon*, the purchaser of the corporate assets of a Medicare provider tried to escape the provider's responsibility to repay Medicare for overpayments. To do so, the purchaser invoked Texas state law on its behalf regarding the assumption of liabilities. The Fifth Circuit said, "federal law governs cases involving the rights of the United States arising under a nationwide federal program such as the Social Security Act. The authority of the United States in relation to funds disbursed and the rights acquired by it in relation to those funds are not dependent upon state law." 21 F.3d at 695 (citations omitted). It is equally true that private parties have no power to alter their legal obligations with Medicare under their provider agreements.

**IV**

Mission's attempt to shoehorn its predicament into the retroactivity provisions of the special rule in 42 C.F.R § 489.13(d)(2) fares no better. By its use of the word "may," the regulation gives CMS discretion about when to grant retroactive coverage. The Secretary's long-standing policy as restated by the DAB was to exercise her discretion under this rule only to providers that were accredited, as that is how CMS knows a provider is in compliance with Medicare's requirements. *See Puget Sound Behavioral Health*, DAB No. 1944 at 14 (2004).

Applying this sound policy to this controversy, the DAB said,

> As in *Puget Sound*, we conclude that section 489.13(d)(2) is inapplicable because the conditions under which it was intended to apply are not present here. Specifically, there was no assurance that Mission's Laguna Beach campus was in compliance with the Medicare participation requirements at the time the services were provided both because Mission was not assigned South Coast's provider agreement due to Mission's failure to assume South Coast's liabilities and because The Joint Commission determined that the Laguna Beach campus was accredited only as of March 18, 2010.

*West Norman Endoscopy Center*, DAB No. 2331 (2010) upon which Mission relies is distinguishable because, as the DAB noted, West Norman "was accredited . . . when it began providing these services," whereas Mission's Laguna Beach campus was not. *Id.* at *8.

### V

In *Heckler v. Community Health*, the Supreme Court said,

> Under the Medicare program, Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. §§ 1395–1395vv, providers of health care services are reimbursed for the reasonable cost of services rendered to Medicare beneficiaries

as determined by the Secretary of Health and Human Services (Secretary). § 1395x(v)(1)(A). Providers receive interim payments at least monthly covering the cost of services they have rendered. 1395g(a). Congress recognized, however, that these interim payments would not always correctly reflect the amount of reimbursable costs, and accordingly instructed the Secretary to develop mechanisms for making appropriate retroactive adjustments when reimbursement is found to be inadequate or excessive. § 1395x(v)(1)(A)(ii). Pursuant to this statutory mandate, the Secretary requires providers to submit annual cost reports which are then audited to determine actual costs. 42 CFR §§ 405.454, 405.1803 (1982). The Secretary may reopen any reimbursement determination within a 3-year period and make appropriate adjustments. § 405.1885.

467 U.S. at 53–54 (footnote omitted).

This controversy could have been avoided had Mission simply availed itself of the path open to it pursuant to § 489.18(c). As the DAB correctly said, "the results of the case would be different had Mission assumed South Coast's liabilities when it acquired its assets." We read this language to have meant, in context, that this case would be different "had Mission accepted South Coast's liabilities to Medicare when it acquired its assets," and not to have referred to liabilities South Coast might have had to patients, physicians, vendors, or other third parties. Mission gambled on an argument based on a contractor's advice, not CMS's. On

September 29, 2009, CMS warned Mission of its sure-to-fail situation, advising Mission that it could not bill for services "until either (1) The Joint Commission conducts a survey at Laguna Beach or (2) Mission Hospital agrees to take assignment of [South Coast's] provider number, including all potential liabilities[.]"    When Mission received this notification, it ceased billing but did not alter its position.

Under the Administrative Procedure Act, an agency decision may be reversed only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A).

> We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose.  Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.  In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations and internal quotation marks omitted). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require

significant expertise and entail the *exercise of judgment grounded in policy concerns*.'"   *Id.* (emphasis added) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)); *see also PAMC, Ltd. v. Sebelius*, 747 F.3d 1214, 1217 (9th Cir. 2014); *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 789–90 (9th Cir. 2003). Moreover, "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare." *Heckler*, 467 U.S. at 64. Accordingly "that [CMS] had not anticipated this problem and made a clear resolution available to [either Mission or South Coast] is of no consequence." *Id.* CMS cannot be expected to foresee every situation that might arise. We repeat what the Court said in *Thomas Jefferson*: The Secretary is expected to "exercise . . . judgment grounded in policy concerns in selecting between permissible interpretations of the regulations." 512 U.S. at 512.

Because we conclude that the Secretary's interpretations and decisions rendered by the DAB in this case were reasonable and satisfied this standard, we **AFFIRM**.

## APPENDIX

## 42 C.F.R. § 412.84 - Payment for extraordinarily high-cost cases (cost outliers).

(a) A hospital may request its intermediary to make an additional payment for inpatient hospital services that meet the criteria established in accordance with § 412.80(a).

(b) The hospital must request additional payment—

   (1) With initial submission of the bill; or

   (2) Within 60 days of receipt of the intermediary's initial determination.

(c) Except as specified in paragraph (e) of this section, an additional payment for a cost outlier case is made prior to medical review.

(d) As described in paragraph (f) of this section, the QIO [Quality Improvement Organization] reviews a sample of cost outlier cases after payment. The charges for any services identified as noncovered through this review are denied and any outlier payment made for these services are recovered, as appropriate, after a determination as to the provider's liability has been made.

(e) If the QIO finds a pattern of inappropriate utilization by a hospital, all cost outlier cases from that hospital are subject to medical review, and this review may be conducted prior to payment until the QIO determines that appropriate corrective actions have been taken.

(f) The QIO reviews the cost outlier cases, using the medical records and itemized charges, to verify the following:

(1) The admission was medically necessary and appropriate.

(2) Services were medically necessary and delivered in the most appropriate setting.

(3) Services were ordered by the physician, actually furnished, and not duplicatively billed.

(4) The diagnostic and procedural codings are correct.

(g) The intermediary bases the operating and capital costs of the discharge on the billed charges for covered inpatient services adjusted by the cost to charge ratios applicable to operating and capital costs, respectively, as described in paragraph (h) of this section.

(h) For discharges occurring before October 1, 2003, the operating and capital cost-to-charge ratios used to adjust covered charges are computed annually by the intermediary for each hospital based on the latest available settled cost report for that hospital and charge data for the same time period as that covered by the cost report. For discharges occurring before August 8, 2003, statewide cost-to-charge ratios are used in those instances in which a hospital's operating or capital cost-to-charge ratios fall outside reasonable parameters. CMS sets forth the reasonable parameters and the statewide cost-to-charge ratios in each year's annual notice of prospective payment rates published in the Federal Register in accordance with § 412.8(b).

(i)

(1) For discharges occurring on or after August 8, 2003, CMS may specify an alternative to the ratios otherwise applicable under paragraphs (h) or (i)(2) of this section. A hospital may also request that its fiscal intermediary use a different (higher or lower) cost-to-charge ratio based on substantial evidence presented by the hospital. Such a request must be approved by the CMS Regional Office.

(2) For discharges occurring on or after October 1, 2003, the operating and capital cost-to-charge ratios applied at the time a claim is processed are based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period.

(3) For discharges occurring on or after August 8, 2003, the fiscal intermediary may use a statewide average cost-to-charge ratio if it is unable to determine an accurate operating or capital cost-to-charge ratio for a hospital in one of the following circumstances:

(i) New hospitals that have not yet submitted their first Medicare cost report. (For this purpose, a new hospital is defined as an entity that has not accepted assignment of an existing hospital's provider agreement in accordance with § 489.18 of this chapter.)

(ii) Hospitals whose operating or capital cost-to-charge ratio is in excess of 3 standard deviations above the corresponding national geometric mean.

This mean is recalculated annually by CMS and published in the annual notice of prospective payment rates issued in accordance with § 412.8(b).

(iii) Other hospitals for whom the fiscal intermediary obtains accurate data with which to calculate either an operating or capital cost-to-charge ratio (or both) are not available.

(4) For discharges occurring on or after August 8, 2003, any reconciliation of outlier payments will be based on operating and capital cost-to-charge ratios calculated based on a ratio of costs to charges computed from the relevant cost report and charge data determined at the time the cost report coinciding with the discharge is settled.

(j) If any of the services are determined to be noncovered, the charges for these services will be deducted from the requested amount of reimbursement but not to exceed the amount claimed above the cost outlier threshold.

(k) Except as provided in paragraph (l) of this section, the additional amount is derived by first taking 80 percent of the difference between the hospital's adjusted operating cost for the discharge (as determined under paragraph (g) of this section) and the operating threshold criteria established under § 412.80(a)(1)(ii); 80 percent is also taken of the difference between the hospital's adjusted capital cost for the discharge (as determined under paragraph (g) of this section) and the capital threshold criteria established under § 412.80(a)(1)(ii). The resulting capital amount is then multiplied by the applicable Federal portion of the payment as determined in § 412.340(a) or § 412.344(a).

(l) For discharges occurring on or after April 1, 1988, the additional payment amount for the DRGs related to burn cases, which are identified in the most recent annual notice of prospective payment rates published in accordance with § 412.8(b), is computed under the provisions of paragraph (k) of this section except that the payment is made using 90 percent of the difference between the hospital's adjusted cost for the discharge and the threshold criteria.

(m) Effective for discharges occurring on or after August 8, 2003, at the time of any reconciliation under paragraph (i)(4) of this section, outlier payments may be adjusted to account for the time value of any underpayments or overpayments. Any adjustment will be based upon a widely available index to be established in advance by the Secretary, and will be applied from the midpoint of the cost reporting period to the date of reconciliation.